1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
     Civil Action No:25-mj-00108
 3   _____

 4   UNITED STATES OF AMERICA,

 5   v.

 6   MOHAMMED SABRY SOLIMAN,

 7   Defendant.

 8   _____

 9           Proceedings before KATHRYN A. STARNELLA, United

10   States Magistrate Judge, United States District Court for

11   the District of Colorado, commencing at 12:19 p.m., June 18,

12   2025, in the United States Courthouse, Denver, Colorado.

13   _____

14   WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE

15   HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

16   _____

17                        APPEARANCES

18           MELISSA HINDMAN and MARLA DUNCAN, appearing for

19   the United States.

20           DAVID KRAUT and JENNIFER BECK, Attorneys at Law,

21   appearing for Defendants.

22   _____

23                     PRELIMINARY HEARING

24

25
```

2

```
 1                    I N D E X

 2    USA Witness:                              Page

 3    Timothy Chan
           Direct examination by Ms. Hindman      12
 4         Cross-examination by Mr. Kraut          43
           Redirect examination by Ms. Hindman     53
 5         Recross-examination by Mr. Kraut        60

 6

 7    Closing Statements:
           By Ms. Hindman                       62,80
 8         By Mr. Kraut                            69

 9

10    Court Ruling                                84

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

3

```
1                P R O C E E D I N G S
2           (Whereupon, the within electronically recorded
3  proceedings are herein transcribed, pursuant to order of
4  counsel.)
5           THE COURT:  All right.  The Court calls Case
6  Number 25-mj-00108, United States v. Mohammed Sabry Soliman.
7           May I have entries of appearance, please, starting
8  with counsel for the United States.
9           MS. HINDMAN:  Good afternoon.  I'm AUSA Melissa
10 Hindman on behalf of the United States.  And with me at
11 counsel table is MarLa Duncan, who is a trial attorney with
12 the Civil Rights Division of the Department of Justice.
13          THE COURT:  All right, good afternoon to both of
14 you.
15          And counsel for defendant.
16          MR. KRAUT:  Thank you, Your Honor.  Good
17 afternoon.
18          David Kraut and Jennifer Beck for Mr. Soliman.  He
19 appears in custody in the jury box with the assistance of
20 the Arabic interpreter here today.
21          THE COURT:  All right.  Good afternoon to both of
22 you, and good afternoon to you, Mr. Soliman.
23          Let me administer the oath to the interpreter.
24          Do you solemnly affirm under the pains and
25 penalties of perjury that you will truly, fairly, and
```

4

1    impartially act as an interpreter in the case now before the

2    Court?

3            MS. SAGER:  Yes, I do.

4            THE COURT:  Thank you.

5            All right, we are here for a preliminary

6    examination hearing and the purpose of this hearing is to

7    determine whether there is probable cause to support the

8    criminal complaint that has been filed against you, Mr.

9    Soliman.

10           So we are not here to establish whether, in fact,

11    you engaged in the conduct that you're alleged to have

12    engaged in or that you committed the hate crime that you've

13    been charged with in this Complaint.

14           We will proceed, whether by proffers or witness

15    testimony, and I invite the Government to present its case.

16           MS. HINDMAN:  Thank you, Your Honor.

17           The Complaint in this case was filed that charged

18    the defendant, Mr. Soliman, with one count of a hate crime

19    under 18 United States Code 249(a)(1) and (2).

20           In the language in that charging document, there

21    were a few alternate theories that were -- that were

22    supported in the Complaint and we are going to streamline

23    our presentation a little bit today on those theories.

24           We are asking the Court to take judicial notice of

25    the Complaint Affidavit which ECF 1-2.

5

1              THE COURT:  Yes.

2              MS. HINDMAN:  And I will supplement that also with

3    some testimony from an FBI agent.

4              THE COURT:  All right, great.

5              Yes, I've reviewed the affidavit at Docket Number

6    1-2 and I grant the request to take judicial notice of it as

7    it's part of the court file.

8              MS. HINDMAN:  Thank you, Your Honor.

9              So we are proceeding with evidence that supports

10   18 United States Code 249(a)(2).  In this subsection, there

11   are five elements of the crime that we believe are supported

12   by the evidence here today.

13             The first element, there's two alternate theories.

14             One is that the defendant actually caused bodily

15   injuries to the victims, which, as you will hear, there were

16   at least eight victims that were injured and many of whom

17   had to receive treatment in the hospital.

18             The alternate theory on -- on that first element

19   is that he attempted to cause bodily injury through the use

20   of fire, a dangerous weapon, or an explosive or incendiary

21   device.

22             The term "explosive or incendiary device" is

23   defined in 18 United States Code 232(5), and within that

24   subsection big (C) points toward what we have evidence of in

25   this case.

6

1          In that subsection, it explains that an incendiary

2    bomb, grenade, fire bomb, or similar device, including any

3    device which consists of or includes a breakable container

4    including a flammable liquid or compound, and a wick

5    composed of any material, which, when ignited, is capable of

6    igniting such flammable liquid or compound and can be

7    carried or thrown by one individual acting alone.

8          And that's what we have here today, it's commonly

9    referred to as a Molotov cocktail.  And you will hear in the

10   testimony, and as described in the affidavit, the two

11   Molotov cocktails that the defendant threw were made of

12   glass carafe bottles filled with gasoline, which is a

13   flammable liquid, with a red rag used as a wick, which he

14   ignited before he threw them.  And he was in possession of

15   additional, similarly created Molotov cocktails and others

16   that were made of Ball jars, also glass containers

17   containing gasoline, many of which had the wick already into

18   them, but that they were not ignited.

19         The second element that we must prove is that the

20   defendant acted because of the perceived national origin of

21   the victims.  And in this case, there was some alternate

22   language in the complaint, but what we plan to present to

23   you today is that the defendant acted because of the

24   perceived national origin of the victims.

25         You will hear evidence in his own words in his

7

1  statement to the police after the incident in handwritten

2  documents that were found in his car and other evidence that

3  support his intent here, and that he was targeting who he

4  described to be Zionists.

5          He explained that Zionism and that Zionists were

6  the people that were currently occupying Palestine and

7  currently occupying, more specifically, Israel and

8  Jerusalem.  In his own words, he differentiates this group.

9  He explains that his enemy are Zionists occupying Jerusalem,

10  which is "our land."

11          He explains his own identity as a Muslim and the

12  history of the occupation of Israel and that his enemy are

13  Zionists, the current occupying force, but they are not

14  necessarily coinciding exactly with the Jewish population.

15          He explains that there are some Jewish people that

16  are not his enemy because they're not Zionists and there are

17  some Zionists that have various faith, but he defines his

18  enemy and his target as Zionists.

19          You'll also hear evidence that the group he

20  targeted were peaceful protesters that were marching

21  silently and holding signs of hostages, people that were

22  still -- that are still held hostage in the Palestinian and

23  Israeli conflict, and these are hostages being held by the

24  Palestinian side of that conflict.

25          Many of these hostages were Israeli, but not all

8

1   of them, and that these protesters -- the victims that the

2   defendant targeted were carrying Israeli flags, American

3   flags and one flag that was a combination of Israeli and

4   American flag.

5           So we believe the evidence will support his

6   perception of Zionists and what he saw of this group in

7   their Israeli identities, with the flags and the Israeli

8   hostages that they were displaying support the element that

9   he targeted these victims and did this conduct, based on his

10  perception of the victims' national origin.

11          The third element is that he acted willfully.

12          The fourth element is that there was an attempt to

13  kill the victims.  This element is optional, but it is an

14  enhancement that enhances the sentence and it is present in

15  this case.  In his own statement, it was his dream to kill

16  them all.

17          The fifth element is the element of interstate and

18  foreign commerce.  There's approximately four different ways

19  that this element is met on the evidence.

20          But focusing in, in the Complaint language, it

21  states that the glass carafes and Ball jars and the gasoline

22  that the defendant combined to make the incendiary device

23  were all made outside of Colorado, and so they traveled in

24  interstate and foreign commerce.  And those were parts of

25  the device that he used, and so that's one way to meet that

9

1    fifth element of interstate and foreign commerce

2           When my FBI agent testifies, he may also testify

3    about the ways in which the businesses in the area were

4    disrupted and the way that the defendant traveled in his car

5    up the highway to get to Boulder and the way in which he

6    used the internet to search how to make Molotov cocktails

7    and how to find his target victims.  All of those are other

8    ways in which that fifth element of interstate and foreign

9    commerce is met in this case.

10          So that is sort of a preview of what we expect to

11   present.  And we will, at this time, supplement the

12   affidavit with the testimony of FBI Special Agent Timothy

13   Chan.

14          THE COURT:  All right.  Special Agent -- yeah.

15   Oh, I'm so sorry.

16          Yes, Mr. Krauter -- Kraut.

17          MR. KRAUT:  Your Honor, if I can just briefly

18   reply before the testimony begins.

19          THE COURT:  Yes.

20          MR. KRAUT:  Thank you.

21          I appreciate the Government narrowing the scope of

22   today's hearing.  I think it will certainly streamline the

23   questioning and legal argument.  Of course, the criminal

24   complaint describes the offense as a hate crime involving

25   actual or perceived race, religion or national origin.  And

10

1  now we know that the Government will only be proceeding on

2  the national origin theory.

3        While certainly helpful for today's hearing, it

4  does raise an important legal question, which is:  What is

5  the definition of national origin?

6        And so I thought before the testimony begins, it

7  may be of some value to the Court for the defense to offer

8  what we believe should be the guiding definition of that

9  term.  It's not a term that's defined in the statute.  It's

10  also not a term that's defined anywhere in the Criminal

11  Code, as far as I can see.

12        However, the Supreme Court has defined the term in

13  a different context in Espinoza vs. Farah Manufacturing

14  Company, which is F-A-R-A-H, 414 U.S. 86, at page 88 (1973).

15        This was a Title VII employment discrimination

16  case.  The Supreme Court wrote:  The term "national origin,"

17  on its face, refers to the country where a person was born,

18  or, more broadly, the country from which his or her

19  ancestors came."

20        As I mentioned, it's a 1973 case, but I do think

21  it's relevant to point out that federal district courts

22  dealing with employment -- employment discrimination suits

23  have continued to use that definition up to the current day.

24        The most recent example of that I could find just

25  quickly this morning, was the United States District Court

11

1    for the Southern District of Ohio in Kalyango v. Ohio

2    University at 2023 Westlaw 2499867-2023.

3            So as far as I can tell -- and I'm no expert in

4    employment discrimination law, but as far as I can tell,

5    that 1973 definition from the Supreme Court is the

6    controlling definition of the term "national origin" in that

7    other context.

8            In the absence of a competing definition in the

9    Criminal Code, we ask the Court to employ that definition

10   when analyzing whether the evidence presented today

11   satisfies the theory the Government is setting forth.

12           THE COURT:  Thank you, Mr. Kraut.

13           MR. KRAUT:  Yes.

14           THE COURT:  Ms. Hindman, you may proceed with the

15   presentation of your case.

16           MS. HINDMAN:  Thank you, Your Honor.

17           And we do agree with that definition, and I can

18   supplement that a little bit more in my argument after we

19   present our testimony of the agent.

20           So at this time, we call FBI Special Agent Timothy

21   Chan as a witness.

22           THE COURT:  Mr. Chan, please raise your right

23   hand.

24           Do you solemnly affirm under penalty of perjury

25   that the testimony you shall give in this matter now before

12

1   the Court shall be the truth, the whole truth, and nothing

2   but the truth?

3         THE WITNESS:  I do.

4         THE COURT:  All right.  Please take a seat and

5   please state your name and spell your last name for the

6   record.

7         THE WITNESS:  First name is Timothy.  Last name is

8   Chan, spelled C-H-A-N.

9         THE COURT:  Thank you.  You may proceed.

10        MS. HINDMAN:  Thank you.

11              TIMOTHY CHAN,

12  called as a witness, having been first duly sworn, testified

13  as follows:

14            DIRECT EXAMINATION

15  BY MS. HINDMAN:

16     Q.  And what is your current title?

17     A.  I'm a special agent with the Federal Bureau of

18  Investigation.

19     Q.  How long have you been a special agent with the

20  FBI?

21     A.  Since 2019.

22     Q.  And in that time, since 2019, what different

23  assignments have you taken as a special agent?

24     A.  I've investigated crimes of cyber, as well as

25  national security.  I've also investigated Indian country

13

1    crimes out on the Navajo Reservation, violent crimes

2    to include child sexual assaults and violent incidents

3    similar to what we're talking about today.

4         Q.    And in your time as a special agent, what cities

5    have you been assigned to?

6         A.    I've been assigned to Cleveland, Ohio; Phoenix,

7    Arizona; specifically Gallup, New Mexico; and Denver,

8    Colorado; specifically Boulder, Colorado.

9         Q.    How long have you been assigned to Boulder,

10   Colorado within the Denver area of responsibility?

11        A.    Approximately three to four months.

12        Q.    And in your time, specifically, in Boulder, what

13   kinds of crimes have you investigated?

14        A.    Drug offenses, as well as other violent crimes, to

15   include drugs, guns, and anything we can help the locals

16   with.

17        Q.    On June 1st of 2025, were you called to respond to

18   an incident in Boulder, Colorado?

19        A.    I was.

20        Q.    Where did you first respond to?

21        A.    I responded to Boulder Police Department.

22        Q.    And when you responded, did you become a part of

23   that investigation?

24        A.    Yes.

25        Q.    What is your current role in that investigation?

14

1     A.   I am the case agent.

2     Q.   Briefly explain what happened that led to you

3  being called to respond on that day.

4     A.   On June 1st, Boulder Police Department called and

5  they were requesting assistance.  What they have provided to

6  me was that there is a potential incident occurring on Pearl

7  Street Mall in Boulder, Colorado.

8          I arrived at Boulder Police Department to see if

9  they needed FBI assistance.  When I arrived on -- at Boulder

10 Police Department, I liaised with their detective commander

11 who provided that there was some explosions, possible

12 incendiary devices that had gone off.  And he had provided

13 he did want FBI assistance.

14         And then he had directed myself and my partner,

15 Boulder Police Department, to find out where the -- at the

16 time, the subject was being attended to for their injuries

17 and he wanted us to go interview them.

18    Q.   Okay.  So you said this happened at Pearl Street

19 Mall.  Can you explain that area of Boulder.

20    A.   Of course.  Pearl Street Mall is in downtown

21 Boulder, Colorado.  It is a strip mall with businesses,

22 plenty of tourists, and street performers and on the

23 weekends, it is busy and plentiful.

24    Q.   And where, specifically, on the Pearl Street Mall

25 did this incident occur?

15

1       A.   It occurred at the old historic courthouse in

2   downtown Pearl Street.

3       Q.   What are the cross streets there?

4       A.   Spruce and 8th, I believe.

5       Q.   And so between the Pearl Street Mall, which -- is

6   that a pedestrian area?

7       A.   Yes, it is.

8       Q.   Between the pedestrian street and the historic

9   courthouse, what -- can you explain the area between?

10      A.   Between --

11      Q.   In front of the courthouse?

12      A.   It was in -- yes, in front of the courthouse, at

13  the very front entrance to the old historic courthouse.

14      Q.   Okay.  And in that space, is there sort of a park

15  area between the courthouse and the pedestrian mall?

16      A.   Yes, there is.  There is a park with statues,

17  benches, and flags hanging.

18      Q.   Okay.  And is that where the incident occurred?

19      A.   That is correct.

20      Q.   Approximately what time did the incident occur?

21      A.   It occurred at approximately between 1:00 to 1:30

22  p.m.

23      Q.   And you said at that time they had taken someone

24  into custody; is that correct?

25      A.   That's correct.

16

1        Q.   And where was that person when you first became

2    involved, where was he in custody?

3        A.   He was in custody at Foothills Hospital in

4    Boulder, Colorado.

5        Q.   And what was his name?

6        A.   His name was Mohammed Sabry Soliman.

7        Q.   And do you see that person -- I'm sorry.

8             Did you eventually go to the hospital and speak to

9    Mr. Soliman?

10       A.   I did.

11       Q.   And so do you see that person here in the

12   courtroom today?

13       A.   I do.

14       Q.   Can you point him out and identify him by an

15   article of clothing.

16       A.   I can.  He's sitting over here in the jury box,

17   wearing a black T-shirt.

18            MS. HINDMAN:  We ask the record to reflect that he

19   has identified the defendant.

20            THE COURT:  So reflected.

21            Well, any objections, Mr. Kraut?

22            MR. KRAUT:  No, Your Honor.

23            THE COURT:  All right.  The record reflects that

24   Agent Chan has accurately identified the defendant.

25            MS. HINDMAN:  Okay.

17

1            (to Interpreter)  Are we going too fast?  Okay.

2        Q.    (By Ms. Hindman) After you responded in the days

3   that followed, was there an extensive investigation?

4        A.    There was.

5        Q.    What parties were involved in that investigation?

6        A.    FBI, State.  In terms of the local partners,

7   Boulder Police Department, as well as the Boulder County

8   Sheriff's Office.

9        Q.    And were there many people on the team between the

10  federal and state law enforcement that were working on this

11  investigation?

12       A.    Yes.

13       Q.    And in preparation for your testimony, and also as

14  your role as case agent, have you had an opportunity to

15  review much of the work of those other investigators on your

16  team?

17       A.    I have.

18       Q.    What kind of steps did you take in the

19  investigation and in preparation today?

20       A.    For myself, I specifically reviewed the case file,

21  as well as the evidence that was collected from the scene.

22  I was also one of the individuals that interviewed Mr.

23  Soliman at the hospital, as well as at the Boulder County

24  Jail.

25            In addition to that, there was also extensive

18

1    interviews done with victims and witnesses that were there

2    present at the time.

3         Q.   And did your review of evidence include reviewing

4    photos and videos that had been taken of the scene and of

5    the incident itself?

6         A.   Yes.

7         Q.   Can you briefly explain what the defendant did

8    leading up to his arrest?  What did he do?

9         A.   Leading up to his arrest, through the review of

10   the video and the photographs, Mr. Soliman was on a camera

11   carrying a -- what can be described as a storage tote with a

12   yellow lid with flowers on top.  He was donning a

13   construction vest, orange in color; wearing a baseball cap

14   on his head and a light-colored shirt.

15             Additionally, he had what appeared to be a weed

16   backpack sprayer on his back as he was walking towards the

17   old historic courthouse.

18         Q.   And so that was when he was arriving towards the

19   courthouse?

20         A.   That's when he was arriving towards the

21   courthouse, that's correct.

22         Q.   And so in the park in front of the courthouse,

23   what did he do with the items from that tote bin?

24         A.   Specifically, the items that were in the tote bin,

25   he had lit two Molotov cocktails, threw one of them that had

19

1  made a direct impact on what, at the time, was the Run for

2  Their Lives group who was out there peacefully protesting

3  and providing awareness for their cause.

4        And then he subsequently also lit a second Molotov

5  cocktail and threw that Molotov cocktail, subsequently

6  lighting himself on fire and removing the clothing that he

7  had on his upper body.

8     Q.   And so after he himself was lit on fire, he

9  removed some clothing.  What did you see him do next in

10 those videos?

11    A.   He picked up two additional Molotov cocktails.

12 They were unlit at the time and he was screaming at the

13 crowd, yelling things such as, "Free Palestine."

14    Q.   And is that what he was doing around the time that

15 the police detained him?

16    A.   That is correct.

17    Q.   Okay.  I want to break down some parts of that.

18        You mentioned the Run for Their Lives group.  What

19 did your investigation show about what is the Run for Their

20 Lives group?

21    A.   Our investigation showed that the Run for Their

22 Lives group is a group raising awareness, specifically for

23 the hostages that were Israeli that are being held in Gaza.

24        The rest of our research entailed that they had

25 advertised on an open Facebook forum, specifically, June

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

20

1    1st:  "Come walk with us, corner of 8th and Pearl, Run for

2    Their Lives."

3         Q.   Is this Run for Their Lives, is this a national

4    group that has chapters in many cities?

5         A.   That is correct.

6         Q.   And so is this the Boulder Chapter of the group?

7         A.   That's correct.

8         Q.   Was this a walk that they did with some

9    regularity?

10        A.   Yes.

11        Q.   How often, approximately, if you know?

12        A.   Once a week.

13        Q.   And so the posting, specifically for the June 1st

14   walk, where did you say that was publicly posted?

15        A.   On Facebook.

16        Q.   And did that provide the time of day that they

17   would be meeting?

18        A.   It did.  It was 1:00 p.m. on June 1st, 2025.

19        Q.   And did it also identify that they would stop

20   there in the park in front of the courthouse on Pearl

21   Street?

22        A.   That is correct.

23        Q.   Have you had an opportunity to review some photos

24   of the group as they conducted their walk on June 1st of

25   this year?

21

1        A.    I have.

2        Q.    And in those photos, what kinds of things did the

3   group display during this walk?

4        A.    They displayed flags from Israel, United States

5   flags, and a combined flag of the United States and Israel.

6        Q.    And in what way did they raise awareness

7   specifically for the Israeli hostages?

8        A.    They had flyers, or what we can consider posters,

9   that had the faces of the individuals being held hostage, as

10  well as their national origin.  Some of them that I was able

11  to review said "Israeli."

12       Q.    Have you reviewed photos that show this group

13  stopping specifically there in front of the courthouse in

14  the park?

15       A.    I have.

16       Q.    And in some of these photos, what, if anything, do

17  you identify that's related to the defendant's presence?

18       A.    After the fact?

19       Q.    I'm sorry.

20             Before the -- before any Molotov cocktails were

21  thrown, what do you see in the pictures of that group that

22  you identify as being relevant to the defendant?

23       A.    There is a very specific photograph that I

24  reviewed that has an individual in a wheelchair, there's an

25  Israeli flag, and in the background, there is Mr. Soliman in

1   a construction vest with his hat, light-colored shirt, the

2   backpack sprayer, the bin with the flowers on top.  And he's

3   bending down and he's right behind them.

4        Q.   And is that black bin with the yellow lid, is that

5   also visible in several of the photos of this group in which

6   they display Israeli flags?

7        A.   Yes.

8        Q.   What did you say that the defendant yelled when he

9   was throwing the Molotov cocktails, according to your

10  investigations and interviews?

11       A.   According to my investigation and the interviews

12  conducted, he was yelling, "Free Palestine."

13       Q.   Have you watched a video in which you can see him

14  actually throwing a lit Molotov cocktail?

15       A.   I have.

16       Q.   When you -- you called it a Molotov cocktail.  Can

17  you explain what that is?  What is it you can see the

18  defendant throwing?

19       A.   Based off my training and experience, the Molotov

20  cocktail that he possesses and throws is a glass carafe jar

21  that is filled with a liquid and a piece of red fabric out

22  of the top with a lid.

23            And then upon -- and based off my training and

24  experience, that creates an explosive, due to the liquid on

25  the interior of it being explosive, being lit through the

23

1    fuse, going onto the ground, and subsequently, covering

2    anything that it touches.

3        Q.   And so in these videos, you see the defendant

4    throw one lit Molotov cocktail, correct?

5        A.   That's correct.

6        Q.   And in another, you see him holding unlit Molotov

7    cocktails; is that correct?

8        A.   That is correct.

9        Q.   And so all of those that you saw him holding, were

10   they comprised, like you just described, of the glass carafe

11   with a clear liquid and the red wick material coming out the

12   top?

13       A.   That is correct.

14       Q.   After the incident, did the investigation team

15   have an opportunity to review items that remained on the

16   scene?

17       A.   Yes, they did.

18       Q.   And have you had an opportunity to review their

19   reports and photographs and materials?

20       A.   I have.

21       Q.   Did -- was that black bin found?

22       A.   It was.

23       Q.   Can you explain what they found on the scene

24   relevant to that black bin.

25       A.   Inside of the black bin, there was approximately

24

1    two to three additional large carafes with the red fabric

2    wick hanging out of the top and lids covering those.

3          Surrounding those were approximately 11 of the

4    smaller Ball jars, as well as red wick scattered throughout

5    the bin.

6    Q.   And so each of these -- I believe you said three

7    carafes and about 11 Ball jars.  Were each of those filled

8    with clear liquid?

9    A.   They were.

10   Q.   And did the investigation team do a field test to

11   determine what that liquid was?

12   A.   They did.

13   Q.   And what did they determine?

14   A.   It was determined via field test that it was

15   gasoline.

16   Q.   And to your knowledge, is gasoline a flammable

17   liquid?

18   A.   Yes, it is.

19   Q.   And to your knowledge, are the glass carafes and

20   Ball jars, are those breakable containers?

21   A.   Yes, they are.

22   Q.   And when you describe the -- the red material, can

23   you explain that a little bit more detail.

24   A.   I can.

25         The red material is a towel-like substance, fabric

25

1    in nature, cut up into strips.

2        Q.    And for the two that he was holding in the video,

3    and then the three carafes in the black bin, were those

4    created so that that red material was into the flammable

5    liquid?

6        A.    That is correct.

7        Q.    And did that red material come out of the top?

8        A.    Yes, it did.

9        Q.    Okay.  And based on your training and experience,

10    does that red material -- as it had been constructed, would

11    that be such that it was a wick, when it's ignited, it would

12    ignite the gasoline?

13        A.    That is correct.

14        Q.    And you said the 11 Ball jars.  Did those have the

15    wicks in them or were the wicks just nearby?

16        A.    It appeared that some had the wicks in them, and

17    then there was also wicks nearby inside of the bin.

18        Q.    And all of these devices that we've described in

19    this bin, are they -- and the ones that he was carrying, are

20    they all such that one person can carry and throw them

21    individually?

22        A.    Yes.

23        Q.    In the investigation afterwards, were the

24    businesses in the surrounding area, were they interviewed?

25        A.    Yes, they were.

26

1      Q.    And what did your team learn from those

2   interviews?

3      A.    We learned as a direct result of the incident that

4   occurred on June 1st, businesses were losing traffic coming

5   into their stores.  Additionally, some of those stores

6   closed down for approximately two to three days due to the

7   scare that had occurred on Pearl Street.

8      Q.    I want to talk about some of the other things that

9   were found there on the scene.

10          You mentioned a backpack weed sprayer.  Was that

11   found on the scene?

12      A.    Yes, it was.

13      Q.    Where was it found?

14      A.    It was found -- based off of the video and the

15   photographs that I reviewed, the backpack sprayer was found

16   in front of the old historic courthouse, behind where Mr.

17   Soliman was throwing his Molotov cocktails.

18      Q.    And was a field test conducted for the liquid that

19   was inside the backpack weed sprayer?

20      A.    Yes.

21      Q.    And what were the results of that?

22      A.    Gasoline.

23      Q.    You also mentioned a hat and vest that the

24   defendant had been wearing.

25          Where were those located after the incident?

27

1      A.   On the ground.

2      Q.   And what was their state?  Can you describe them a

3 little more?

4      A.   The state of them is that they were burned, or

5 rather charred.  We recovered both of those items, a

6 charred-blue-in-nature hat, and then an orange, what can be

7 called construction vest.

8      Q.   Was there also a shirt nearby?

9      A.   Yes.

10      Q.   Can you explain that shirt?

11      A.   Yes.  The shirt was light in color, and written on

12 the shirt in permanent marker, or what appeared to be

13 permanent marker was the numbers 1187.

14      Q.   You said that was handwritten on the shirt?

15      A.   Yes.

16      Q.   Okay.  Was a phone found nearby?

17      A.   Yes.

18      Q.   What kind of phone was that?

19      A.   It was a Motorola phone.

20      Q.   Was another phone located relevant to the

21 defendant in the course of the investigation?

22      A.   Yes.

23      Q.   Can you explain how that was located.

24      A.   The phone that you're talking about was found --

25 it was an iPhone, specifically, and it was recovered in

1    Colorado Springs.

2        Q.    And was that provided to law enforcement?

3        A.    Yes, it was.

4        Q.    And was that determined to be the defendant's, as

5    well?

6        A.    Yes.

7        Q.    Also on the scene, in the area near where the

8    defendant had been standing when he was holding the Molotov

9    cocktails, did the investigative team find any of the parts

10   of the devices that were actually ignited and thrown?

11       A.    Yes, they did.

12       Q.    Can you explain that a little bit more.

13       A.    Specifically, in the burned areas, they recovered

14   broken glass that was from the Molotov cocktail that was

15   thrown and subsequently broken and ignited.

16       Q.    Did they also find the two Molotov cocktail

17   devices that he had carried but did not ignite?

18       A.    That is correct.

19       Q.    Can you explain that a little bit more, what they

20   found.

21       A.    Of course.

22            The two Molotov cocktails that he was carrying

23   after he threw the other ones, they were the ones -- based

24   off of the video that I had reviewed, were in his hands.

25   Boulder Police Department showed up on scene, had provided

29

1    him commands.

2            At that point, he had dropped those Molotov

3    cocktails and they were on the ground.  And then

4    subsequently, Boulder Police Department took him into

5    custody.

6        Q.   Okay.  Was the defendant's car found nearby?

7        A.   Yes, it was.

8        Q.   What, if anything, was found in the defendant's

9    car?

10       A.   In the car, specifically was funnels, as well as

11   documents.

12       Q.   Was there also red gas canisters?

13       A.   Yes, there were.

14       Q.   You mentioned documents.  Were these documents

15   handwritten or printed or some mix of both?

16       A.   It was a mix.

17       Q.   I want to focus on some of the handwritten

18   documents.

19            In those handwritten documents -- have you had a

20   chance to review that document?

21       A.   Yes.

22       Q.   In the handwritten document found in the

23   defendant's car, what, if anything, did it say about the

24   Number 1187 that you said had been handwritten on the

25   defendant's shirt?

30

1      A.   Specifically, handwritten was the Number 1187, and

2  next to it was what 1187 meant to the person writing it.

3  And that was the year that Israel was liberated by the

4  Muslims.

5      Q.   Okay.  And so it signified that the year 1187 is

6  when the Muslims returned to liberate Jerusalem?

7      A.   That is correct.

8      Q.   Okay.  Did that document also discuss some of the

9  oppression of Muslims during the time that they did not

10  occupy Jerusalem?

11      A.   That is correct.

12      Q.   In that handwritten document, did it also explain

13  who the writer's enemies were?

14      A.   Yes.

15      Q.   What did it say about his enemies?

16      A.   It specifically stated that his enemies were the

17  Zionists and the Zionist followers and it will stay that way

18  until Israel is liberated.

19      Q.   Did it explain that Zionism were the enemies that

20  were currently occupying Israel?

21      A.   Yes.

22      Q.   Okay.  You mentioned the two -- I'm sorry.

23           You mentioned several things that were found that

24  the defendant had used to create Molotov cocktails.

25           Did your investigation reveal where he had

31

1  purchased a lot of these items?

2      A.   It did.

3      Q.   Can you give us a summary of what purchases you

4  identified that were relevant to what he did that day?

5      A.   Through the course of our investigation, we had

6  canvassed multiple businesses based off of an interview that

7  was conducted with Mr. Soliman.

8          Approximately two to three days prior to the

9  attack on June 1st, we were able to obtain video footage, as

10  well as some receipts at Home Depot that highlighted the

11  purchase of the backpack sprayer, as well as the flowers

12  that appear to be on top of the storage bin.

13         Additionally, there was purchases at Target -- at

14  Target in Castle Rock.  The purchases were four carafe jars

15  and 12 Ball jars at one time and then an additional purchase

16  was for four additional carafes.

17         There was also another additional purchase that

18  occurred at Walmart in Castle Rock.  Those purchases

19  consisted of scissors and permanent markers.

20     Q.   Did you also identify where he obtained gasoline

21  in the early morning of June 1st?

22     A.   Yes.

23     Q.   Where was that, approximately?

24     A.   Approximately?  At Castle Rock.

25     Q.   Did he make several stops in Castle Rock?

32

1       A.    Yes, he did.

2       Q.    Okay.  And the time period for these purchases

3   began approximately two days before the attack; is that

4   correct?

5       A.    That's correct.

6       Q.    And led up to several purchases that morning; is

7   that right?

8       A.    That's correct.

9       Q.    For the glass carafes, based on your training and

10  experience and information learned in the investigation,

11  were those carafes made -- manufactured outside the District

12  of Colorado?

13      A.    Yes.

14      Q.    For the glass Ball jars, based on your training,

15  experience, and investigation, were they -- those

16  manufactured outside of Colorado?

17      A.    Yes.

18      Q.    And based on your training, experience, and

19  investigation, was the gas that he obtained on the morning

20  of June 1st made outside of Colorado?

21      A.    Yes.

22      Q.    Okay.  So you said earlier that you eventually

23  went to the hospital to speak to the defendant there; is

24  that correct?

25      A.    That is correct.

33

1      Q.   Who conducted this interview with you?

2      A.   My partner at Boulder Police Department, Detective

3  Andrea Tuck.

4      Q.   And who was asking most of the questions?

5      A.   Andrea Tuck.

6      Q.   In that interview, was it completed at the

7  hospital, or was it continued at another location?

8      A.   It was continued at another location.

9      Q.   And what was that location?

10     A.   That was the Boulder County Jail.

11     Q.   Okay.  So the interview, including speaking with

12  the defendant at the hospital and at the Boulder County

13  Jail, before speaking to him at each location, was he given

14  his Miranda warnings?

15     A.   Yes.

16     Q.   And was the totality of the interview in both

17  locations recorded on video?

18     A.   Yes, it was.

19     Q.   Okay.  And you said Detective Tuck was asking most

20  of the questions?

21     A.   That's correct.

22     Q.   Okay.

23          I want to talk about a couple of things that the

24  defendant said in the course of that statement.

25          What did he tell you about his plan for that day?

34

1    What did he intend to do?

2        A.    He specifically told me he intended to kill

3    Zionists.

4        Q.    Did he explain to you what Zionists -- who

5    Zionists were to him?

6        A.    According to the interview, Zionists were the

7    individuals that are occupying Israel and he specifically

8    stated, occupying his land.  And then it was clarified with:

9    What is your land?  And he -- he provided that it was

10   Palestine.

11       Q.    Did he differentiate Zionists from the Jewish

12   population?

13       A.    Yes, he did.

14       Q.    Can you explain that a little bit more.

15       A.    He differentiated the Zionists from the Jewish

16   population and his attack that was occurring that day,

17   though, based off of the flags that he saw when they

18   approached the courthouse.

19            Additionally, he also provided a distinction

20   because he provided to us that he had worked for Jewish

21   individuals before; that through the course of what he did

22   for work, he also had given Jewish individuals rides via

23   Uber.

24       Q.    So just to make sure that I understand that right.

25            So he explained some examples of how he had

35

1    interacted with Jewish people; that he did not have an issue

2    with all Jewish people; is that correct?

3        A.    That is correct.

4        Q.    Okay.  But he said that his target had been to

5    kill Zionists?

6        A.    That is correct.

7        Q.    Okay.  And he identified Zionists to be the people

8    currently occupying the land of Israel and Palestine?

9        A.    That is correct.

10       Q.    Okay.  Did he say to you how long he had been

11   planning this attack?

12       A.    Approximately a year.

13       Q.    And why did he say he decided to do it now?

14       A.    Specifically, because he was waiting for his

15   daughter to graduate.

16       Q.    Did he say what he did with the Molotov cocktails

17   there at the park?

18       A.    He provided that he had thrown them to injure

19   people.

20       Q.    I'm sorry, say that one more time.

21       A.    Thrown them to injure people.

22       Q.    Did he explain what he had planned to do with the

23   other Molotov cocktails that he had created?

24       A.    I can't remember.

25       Q.    Did he explain how he had learned to create these?

36

1     A.   He stated that he looked up on YouTube how to

2  create Molotov cocktails.

3     Q.   Did he give you some detail about where he had

4  gone to purchase these components?

5     A.   Yes.

6     Q.   What did he say to you about his knowledge of the

7  Run for Their Lives group?

8     A.   He provided that he had conducted an Internet

9  search specifically for Zionist events in Boulder, and

10  that's how he found them.

11     Q.   What did he say that he did once he first got to

12  the park?

13     A.   He specifically told me that when he first got to

14  the park, he did not initially see them.  Then he saw them.

15  They were behind the courthouse and that they were walking,

16  and then he started to see them come around the front.  And

17  at that point, he positioned himself next to a tree and then

18  he conducted his attack as they lined up.

19     Q.   Did he explain to you what he saw of that group

20  that identified for him that they were the group he was

21  wanting to target?

22     A.   He provided that it was the Israeli flags.

23     Q.   I'd like to go back.

24         You mentioned that there was a Motorola phone

25  found on the scene and another iPhone that was provided to

37

1    law enforcement later; is that correct?

2         A.   That is correct.

3         Q.   Okay.  Is the analysis of those phones, pursuant

4    to a search warrant, is that still ongoing?

5         A.   It is.

6         Q.   Okay.  Have you had a chance to review some

7    preliminary information that's come in from those phones?

8         A.   Yes.

9         Q.   To your knowledge, did the search of those phones,

10   did they show when he had started looking, making searches

11   online regarding Zionism?

12        A.   Yes.

13        Q.   And what was the approximate date of when that had

14   started on those devices?

15        A.   Approximately, September 2024, the search for

16   Zionism occurred.

17        Q.   Did the search of the phone show when he started

18   conducting searches online, specifically for Zionist events

19   in Colorado or in Boulder?

20        A.   Yes.

21        Q.   Were those the search terms he used?

22        A.   Yes, those were the search terms he used.

23        Q.   And approximately when did he begin those

24   searches?

25        A.   Approximately May 2025.

38

1       Q.   Okay.

2            MS. HINDMAN:  One moment, Your Honor.

3            THE COURT:  Sure.

4       Q.   (By Ms. Hindman) Okay.  I want to clarify one

5  thing about the defendant's statement.

6            When he explained to you what Zionist meant, is

7  this a topic that came up, kind of scattered throughout the

8  interview?

9       A.   Yes.

10       Q.   Okay.  What are some of the things he said to

11  explain what he believed Zionists -- who he believed

12  Zionists were?

13       A.   Some of the things that came up were -- at first,

14  it was the individuals behind -- or the individuals that

15  have money to start wars, as well as -- mainly, when I had

16  clarified it and not understanding what Zionist was at the

17  time, he provided to me that they were the individuals that

18  were supporting Israel, occupying Israel.

19       Q.   You said earlier he used the term "our land."

20       A.   Yes.

21       Q.   What did he clarify to be "our land"?

22       A.   When asked, What does "our land" mean, he provided

23  that it was Palestine.

24       Q.   And did he explain that Zionists he believed were

25  anyone that supported the existence of Israel on his land?

39

1       A.    Yes.

2       Q.    Okay. I want to talk a little bit more about the

3   victims and people that were in the area when this happened.

4             Approximately how many people were in the Run for

5   Their Lives group?

6       A.    That day, approximately 20 to 21.

7       Q.    And were there other people in the park at the

8   time and in the immediate vicinity of where the defendant

9   was doing this that were not associated with the Run for

10  Their Lives group?

11      A.    Yes.

12      Q.    Approximately how many people so far has your

13  investigation identified of those people in the park?

14      A.    Approximately 30.

15      Q.    You mentioned earlier that there was a photograph

16  of someone in a wheelchair.  Was that person a member of the

17  Run for Their Lives group?

18      A.    Yes.

19      Q.    And approximately how old was the person in the

20  wheelchair?

21      A.    I would estimate them to be 11 to 13 years old.

22      Q.    And that person, what were they holding?

23      A.    An Israeli flag.

24      Q.    And what, if anything, was that 11-, 12-year-old

25  wearing on his head?

40

1      A.   A yamaka.

2      Q.   And in that photo of that child holding the

3  Israeli flag, in that photo, can you see the defendant in

4  the background?

5      A.   Yes, you can.

6      Q.   And at that time, the defendant had not yet thrown

7  the Molotov cocktail, correct?

8      A.   That is correct.

9      Q.   When he threw the lit Molotov cocktail -- the lit

10  glass carafe with gasoline and a wick, how did the crowd

11  around him react?

12      A.   Scared.  They ran.  According to the statements

13  that we received and the individuals that we interviewed,

14  they were scared.  They heard a boom, they felt the heat,

15  and immediately, they started to scatter.

16      Some of them started to see individuals on the

17  ground.  Their friends that were a part of that peaceful

18  movement, they were on the ground and they were just trying

19  to get them help.  They saw that some of them were on fire.

20      Q.   Were people injured?

21      A.   Yes.

22      Q.   You said that people were on fire.  Was one of the

23  victims on fire?

24      A.   Yes.

25      Q.   What did the crowd do to address the victim who

41

1  was on fire?

2      A.   They specifically tried to put the fire out, run

3  to stores to grab supplies in order to try to mitigate the

4  situation and tried to address the injury.

5      Q.   Did they douse her with water?

6      A.   Yes, they did.

7      Q.   Approximately how many people were injured?

8      A.   Approximately eight.

9      Q.   And did those injuries largely include burns?

10     A.   Yes.

11     Q.   What was the severity and the range of severity of

12  some of these burns, the injuries?

13     A.   Based off of the interviews that we've conducted,

14  some of them, 60 percent of their body.

15     Q.   Did some of them have less severe burns, as well?

16     A.   Yes.

17     Q.   Did several of those -- approximately eight

18  injured victims, did several of them receive treatment at

19  the hospital?

20     A.   Yes, they did.

21     Q.   And were some of them actually flown to the

22  hospital by helicopter?

23     A.   Yes.

24     Q.   Are some still in the hospital today?

25     A.   That is correct.

42

1  Q. Some of those injured were also released from the

2 hospital, correct?

3  A. That's correct.

4  Q. And was there, at least, one who was injured but

5 didn't actually need medical treatment?

6  A. That's correct.

7  Q. After the thrown-lit Molotov cocktails, after the

8 defendant did that and injured those people, what in the

9 videos do you see him continue to do around the crowd that

10 is responding to these injured victims?

11  A. He's yelling at the crowd.  He's holding two unlit

12 Molotov cocktails, and he's yelling at the crowd.

13   From the examination of the video, it was "Free

14 Palestine" and additionally something along the lines of,

15 "How many children?"  And then it was unable to tell what

16 after that.

17  Q. And based on your interviews of those witnesses,

18 do you understand that he was yelling against Zionists?

19  A. Yes.

20  Q. And yelling about people that had killed children?

21  A. Yes.

22  Q. Okay.  One moment.

23   THE COURT:  Sure.

24   MS. HINDMAN:  I have no other questions for the

25 witness at this time.

43

```
 1           THE COURT:  All right.

 2           MS. HINDMAN:  Thank you.

 3           THE COURT:  All right, Mr. Kraut.

 4           MR. KRAUT:  Thank you very much, Your Honor.

 5           If I may inquire?

 6           THE COURT:  I'm sorry?

 7           MR. KRAUT:  If I may inquire?

 8           THE COURT:  Yes, you may, absolutely.

 9           MR. KRAUT:  Thank you.

10                     CROSS-EXAMINATION

11  BY MR. KRAUT:

12      Q.   Good afternoon -- sorry, Agent Chan.

13      A.   Good afternoon.

14      Q.   In reviewing the other police reports prepared by

15  your colleagues at the Boulder Police Department, Boulder

16  County sheriffs, other law enforcement agencies, is it true

17  that you saw information relating to Mr. Soliman's alleged

18  motivation to carry out these attacks?

19      A.   Yes.

20      Q.   Okay.  That's really what I want to focus most of

21  my questions on here today, is the sources of information

22  relating to his motive.  Okay?

23      A.   Sure.

24      Q.   Is it true that law enforcement officers spoke

25  with his family very shortly after this incident?
```

44

1        A.    That is correct.

2        Q.    And in that conversation, is it true that his wife

3   and his oldest daughter reported to law enforcement that

4   what was being described that he did is totally out of

5   character?

6        A.    That is correct.

7        Q.    They described to law enforcement that Mr.

8   Soliman, to their knowledge, has never hated Jewish people?

9        A.    That is correct.

10       Q.    And they, in general, expressed shock at what they

11   were being told had occurred?

12       A.    That's correct.

13       Q.    They had no inkling at all that he was planning to

14   do this or even thinking about doing anything like this?

15       A.    That's correct.

16       Q.    You also saw, from your own work and the work of

17   other law enforcement agencies, what he had done to identify

18   this group, the Run For Your Lives walking group in Boulder,

19   correct?

20       A.    That's correct.

21       Q.    And you determined that one of the things that he

22   did was view either a Facebook page or a website dedicated

23   to explaining what this group is and the things that they

24   do?

25       A.    That's correct.  As well as a search for Zionist

45

1    events, Boulder, Colorado.

2        Q.    Right.  He uses those search terms and, through

3    that search term, lands upon the Run For Your Lives website?

4        A.    That's correct.

5        Q.    And then I imagine either you or other law

6    enforcement officers also visited that website to see what

7    it would look like to a person doing that search, right?

8        A.    Yes.

9        Q.    And so is it true, then, that that website

10   specifically notes that they encourage anyone who's

11   interested in joining them to carry flags of all the

12   countries whose citizens are among the hostages being held

13   in Gaza?

14       A.    My research didn't go into in-depth in there.  My

15   research focused on June 1st and the posting for June 1st.

16       Q.    The events that happened?

17       A.    The event, yes.

18       Q.    Did you learn that the Run For Your Lives website

19   also invites others to show that we all care, regardless of

20   nationality or religion?

21       A.    Yes.

22       Q.    And did you also learn that that organization,

23   through their website, makes very clear that a person does

24   not need to be Jewish or Israeli to be disturbed by the

25   crisis or to participate in their walks?

46

1      A.   That is correct.

2      Q.   In Mr. Soliman's statements to you and the

3  detective from the Boulder Police, Detective Tuck, is it

4  true that in that conversation, he told you and Detective

5  Tuck, "I hate the Zionist organization because they support

6  and fund the bombings in Palestine"?

7      A.   That's correct.

8      Q.   And he told you, "I searched for Zionist groups

9  and found this one in Boulder"?

10     A.   That's correct.

11     Q.   He also said, "Anyone who supports the existence

12  of Israel on our land, Palestine, is a Zionist in his mind"?

13     A.   That's correct.

14     Q.   He told you, "This has nothing to do with Jewish

15  people or Jewish community"?

16     A.   That is correct.

17     Q.   He made very clear that he had worked at, I think,

18  a medical center owned by Jewish people and had no issues

19  with them or that employment?

20     A.   That is correct.

21     Q.   At one point he stated Zionists have no religion

22  at all?

23     A.   That's correct.

24     Q.   He never said to you or to Detective Tuck, during

25  that interview, that, in his mind, anyone who was born in

47

1   Israel is a Zionist?  He never said that, did he?

2        A.   Correct, he did not.

3        Q.   And he never said during that interview, Anyone

4   whose ancestors were born in Israel is a Zionist?

5        A.   Correct.

6        Q.   In investigating these crimes, is it true that you

7   and other law enforcement officers gathered information to

8   determine whether or not Mr. Soliman had any criminal

9   history?

10        A.   That's correct.

11        Q.   And you determined that he did not?

12        A.   That's correct.

13        Q.   And is it also true that you attempted to find out

14   whether or not he had ever previously engaged in conduct of

15   a similar nature?

16        A.   That's correct.

17        Q.   And you determined that he had not; that he had

18   never done anything like this before?

19        A.   Correct.

20        Q.   And you also determined he is -- how old, do you

21   remember?

22        A.   Approximately 47.

23        Q.   47.

24             I have a couple of questions for you about the

25   year 1187, which you explained is apparently an important

48

1    year to Mr. Soliman, based on the investigation you

2    conducted.

3         A.    That's correct.

4         Q.    And you came to that conclusion because it was

5    written on some paperwork that was found in his car after

6    the incident, right?

7         A.    That's correct.

8         Q.    And then it was also written, apparently, by hand

9    with a marker on the T-shirt he had been wearing during the

10   attack?

11        A.    That's correct.

12        Q.    And then at some point during the incident, he

13   removed the T-shirt and that T-shirt was later recovered?

14        A.    That's correct.

15        Q.    Is it true that, according to your research and

16   what you learned about this moment in history that is of

17   apparent importance to Mr. Soliman, that, essentially, from

18   about 450 years or so before 1187 -- or before 1100, I

19   should say, that Muslim forces, essentially, lived in and

20   controlled what is now Jerusalem?

21        A.    That's correct.

22        Q.    And that in the late part of the 11th Century,

23   1096 to about 1099, there was something called the First

24   Crusade.  Did you learn about that?

25        A.    I did not.

49

1    Q.    And did you learn that that -- that First Crusade

2    resulted in people who were Christian religion moving into

3    and taking over control of Jerusalem?

4    A.    I did not learn that throughout my research of

5    1187.

6    Q.    Did you learn that in 1187, the actual battle, the

7    actual moment that is of, apparently, great importance to

8    Mr. Soliman, that it was, essentially, a battle between

9    Muslim forces and Christian forces over which of those two

10   religions can control Jerusalem?

11   A.    That -- that, I did learn, yes.

12   Q.    Okay.  And that there's a battle referred to as

13   the Battle of Hattin, H-a-t-t-i-n, in which the Muslim

14   forces fought the Christian crusaders and took over

15   Jerusalem --

16   A.    Correct.

17   Q.    -- in 1187?

18   A.    In 1187, yes.

19   Q.    And that, then, began a series of additional

20   crusades in which the Christians attempted to regain control

21   of Jerusalem over the next 300 years or so?

22   A.    Historically, yes.

23   Q.    Okay.  And did you also learn that during that

24   entire period, going all the way back from about 650 through

25   the 14th Century, that there's really no indication, no

50

1    evidence that the Jewish people at any point controlled what

2    is now Jerusalem, correct?

3        A.    My research did not go that far in depth.  It

4    focused on 1187.

5        Q.    Okay.  And your research revealed that 1187 was a

6    fight between Muslims and Christians?

7        A.    That's correct.

8        Q.    Okay.  And that fight, that battle did not involve

9    Jewish people?

10       A.    Correct.

11       Q.    Did you learn in your research about that

12   historical time that throughout the Middle Ages, Jewish

13   people in Islamic lands were integrated into local economies

14   and lived side by side along -- next to Muslim people?

15       A.    I know that historically, based off of what I've

16   learned, but not throughout the course of this

17   investigation.

18       Q.    But you would agree to that?

19       A.    I would agree.

20       Q.    In reviewing the video and the witness statements

21   about this incident in Boulder, is it true that there is no

22   evidence that Mr. Soliman ever said anything about

23   attempting to kill or intending to kill Israeli people?

24       A.    That's correct.

25       Q.    It sounds, from your earlier testimony, that many

51

1   people reported, and video, in fact, recorded him saying,

2   "Free Palestine"?

3       A.   That is correct.

4       Q.   And he later made remarks to you and Detective

5   Tuck about hating Zionists --

6       A.   That is correct.

7       Q.   -- and the idea of Zionism, right?

8       A.   Yes.

9       Q.   But there was no evidence that he attempted to

10  identify the Run For Your Lives group because he believed

11  they were all Israeli people, correct?

12      A.   During our interview, he specifically stated that

13  he identified the group based off of the flags --

14      Q.   Right.

15      A.   -- and those flags to be Israeli.

16      Q.   That's right, and I need to clarify that.  Thank

17  you.

18           So what had happened here is that he identified --

19  in the two or three days leading up to this incident, he

20  identified through his own Internet research that the Run

21  For Your Lives group will be in Boulder doing their walk on

22  June 1st?

23      A.   That's correct.

24      Q.   Okay.  Then he gets to Boulder on June 1st, and

25  from what you could tell from the video and from talking to

52

1    him, he's looking for the people that he has previously

2    identified as the folks who are going to be the target of

3    this incident?

4        A.   That's correct.

5        Q.   Okay.  And then he sees an Israeli flag, or maybe

6    multiple, and decides in his mind, That must be the group

7    that I learned about online, right?

8        A.   Correct.

9        Q.   Okay.  So it's not that he just went there, saw a

10   person with an Israeli flag and decided to attack that

11   person?

12       A.   That is correct.

13       Q.   What it is, is that he had previously identified a

14   target and then noticed the Israeli flag as a signal to him

15   that that's probably his previously identified target?

16       A.   That's correct.

17       Q.   Okay.  And he never said anything to you during

18   your interview, or to anyone else, as far as you know, that

19   he believed the people in this group were all people who

20   were from Israel?

21       A.   Correct.

22       Q.   Or necessarily contained any people from Israel?

23       A.   Correct.

24       Q.   Or any people whose ancestors were from Israel?

25       A.   Correct.

53

1          MR. KRAUT:  Your Honor, if I can have just a

2   moment, please.

3          THE COURT:  You may.

4          MR. KRAUT:  And, Your Honor, can Ms. Beck please

5   check in with Mr. Soliman before I conclude my questioning.

6          THE COURT:  Yes, absolutely.

7          MR. KRAUT:  Thank you very much.  It should just

8   take a moment.

9          THE COURT:  All right.  Thanks.

10          (Pause).

11          MR. KRAUT:  Your Honor, the defense has no further

12   questions.

13          THE COURT:  All right, thank you.

14          Ms. Hindman, do you have a redirect?

15          MS. HINDMAN:  Yes, Your Honor.

16          THE COURT:  Okay.

17                    REDIRECT EXAMINATION

18   BY MS. HINDMAN:

19     Q.   Special Agent Chan, I want to clarify a couple

20   things.

21          We discussed earlier the analysis of the two

22   cellphone devices that were the defendant's.  In that

23   preliminary analysis that you've learned, did it show that

24   he used a Google search and searched for the terms "Colorado

25   Zionist event"?

54

1       A.   Yes.

2       Q.   And did he also search for the term "Boulder

3   Zionist event"?

4       A.   Yes.

5       Q.   And approximately when were those searches

6   started?

7       A.   May 2025, approximately.

8       Q.   And the preliminary analysis of this device, you

9   can't tell what search results came back from those terms,

10  correct?

11      A.   Correct.

12      Q.   And so you can't tell exactly which websites the

13  defendant clicked on after putting those search terms into

14  Google; is that right?

15      A.   Correct.

16      Q.   Okay.  You discussed your knowledge of the public

17  website of Run For Their Lives group.  Is that based on your

18  looking through the website?

19      A.   That's correct.

20      Q.   Okay.  But you don't know which parts of that

21  website the defendant actually reviewed, correct?

22      A.   That's correct.

23      Q.   In his statement to you, though, he did talk about

24  looking on the Internet for that group, correct?

25      A.   Yes.

55

1    Q.    Okay.  And I do have the report of your statement

2    with him if you need it to refresh your recollection.  I

3    think you remember a lot of detail, but I just want to make

4    sure that I'm specific here.

5           So in his statement to you, did he explain that he

6    used the Internet to search for this group and identified,

7    based on his search, that that group was Zionist?

8    A.    Yes.

9    Q.    And did he also explain to you that the flags and

10   signs that he saw them holding in Boulder on Sunday, June

11   1st, are what he saw that made him think that was the

12   Zionist group he'd found online?

13   A.    Yes.

14   Q.    In your review, what flags were they holding?

15   A.    Israeli flags.

16   Q.    Were they also holding American flags?

17   A.    Yes.

18   Q.    And was there one flag that was sort of an Israeli

19   and American flag together?

20   A.    That's correct.

21   Q.    Were they holding -- to your knowledge, holding

22   signs of any other countries?

23   A.    No.

24   Q.    The signs that they were holding had hostages on

25   them, correct?

56

1        A.    That's correct.

2        Q.    Have you had a chance to look at some of those

3    signs?

4        A.    Yes.

5        Q.    Do those signs say what the nationality of those

6    hostages are?

7        A.    It does.

8        Q.    And the signs that you reviewed, what

9    nationalities are identified?

10       A.    Israeli.

11       Q.    Going back to your statement with the defendant,

12   when he was speaking to you and your partner, did he explain

13   Zionists to be a cancer group?

14       A.    Yes.

15             THE COURT:  I'm sorry, what kind of group did you

16   say?

17             MS. HINDMAN:  Cancer.

18             THE COURT:  Okay.

19        Q.   (By Ms. Hindman) Did he explain that Zionists, in

20   his mind, included anyone that supported the existence of

21   Israel?

22       A.    Yes.

23       Q.    Did he explain frustrations with other countries

24   like the US and the UK because they supported the

25   establishment and existence of Israel?

57

```
 1        A.   Yes.

 2        Q.   And so did he explain that he used the term

 3   "Zionist" for anyone that supported the existence of Israel

 4   on his -- his land?

 5        A.   Yes.

 6        Q.   In his words, did he explain his land to be

 7   Palestine?

 8        A.   Yes.

 9        Q.   And did he explain his -- his land to include

10   Jerusalem?

11        A.   Yes, yes.

12        Q.   But he didn't specify Israel as much; he focused

13   more on the broader land, correct?

14        A.   That's correct.

15        Q.   And he specified that Zionists were his enemy,

16   correct?

17        A.   That's correct.

18        Q.   And so his enemy are those that supported the very

19   existence of the nation of Israel, correct?

20        A.   That is correct.

21        Q.   You were asked a little bit about the history of

22   the Middle East and I just want to make sure we clarify the

23   source of your knowledge.

24        A.   Um-hmm.

25        Q.   Are you an expert on Middle East history?
```

58

1    A.    No, I am not.

2    Q.    Have you done any extensive research on the

3    history of the Middle East?

4    A.    No.

5    Q.    Is the main source of your knowledge hearing the

6    defendant's own explanation?

7    A.    That is correct.

8    Q.    Is one source of your knowledge reading the

9    handwritten note found in the defendant's car?

10    A.    Yes.

11    Q.    And so your source of knowledge for understanding

12    the significance of 1187 written on the defendant's shirt is

13    his own words, right?

14    A.    That is correct.

15    Q.    Did he explain to you in his statement about

16    trying to write on his shirt?  What did he say to you about

17    that?

18    A.    He had provided to me that he was going to write

19    his words on his chest, but that he had failed to have time

20    to do so because things went too fast.

21    Q.    But did he say he tried?

22    A.    Yes.

23    Q.    And are those Sharpies, are those one of the items

24    that you saw him purchasing at Walmart or Target in the days

25    before the attack?

59

1      A.   Yes.

2      Q.   And in his own words, in the handwritten document

3  from his car, is that where it explains that 1187 is when

4  Muslims returned and liberated Jerusalem after 88 years of

5  oppression and persecution?

6      A.   Yes.

7      Q.   And to your knowledge, is Jerusalem within the

8  land that is now established to be the Israeli nation?

9      A.   Yes.

10          THE COURT:  Ms. Hindman, I'm sorry to interrupt,

11 but this whole issue of whether Zionism is a category, is a

12 national origin category, it seems to me, because I want to

13 be mindful of time, and I don't know if you have other

14 witnesses you want to present, and I don't know if

15 defendant -- defense counsel has anything else they wish to

16 present; however, we're talking about potentially -- or in

17 all likelihood, a legal definition.

18          The standard for probable cause in this context

19 for a preliminary examination hearing is relatively low.  It

20 seems to me, what exactly -- is Zionism a category of

21 national origin, it seems to me that's an issue that should

22 be litigated before the district judge, whether on a motion

23 of some kind or at the outset of trial.

24          So I'd like to hear your thoughts about that, and

25 then I invite Mr. Kraut to respond, since he's the one who

60

1   flagged this issue.

2          MS. HINDMAN:  You're right, Your Honor.  And I'm

3   actually completely done --

4          THE COURT:  Okay.

5          MS. HINDMAN:  -- with my questioning of this

6   witness if we'd like to excuse him at this point, and I can

7   move directly into my argument on that point.

8          THE COURT:  Okay, excellent.  You're excused,

9   Agent Chan.  Thank you.

10          MR. KRAUT:  Sorry, Your Honor.  Can I ask two

11   redirect -- or two re-cross questions?

12          THE COURT:  Very, very briefly.

13          MR. KRAUT:  And I can just do them right from

14   here.

15          THE COURT:  Okay.

16                      RECROSS-EXAMINATION

17   BY MR. KRAUT:

18      Q.   Agent Chan, the online searches that you found

19   during your preliminary examination of Mr. Soliman's phone,

20   you said he was searching Colorado Zionist events, right?

21      A.   Yes.

22      Q.   Those search terms did not include "Israeli event

23   in Colorado," correct?

24      A.   That's correct.

25      Q.   Okay.

61

1         And then the second question is:  You talked a

2    little bit about the signs that the people at the Run For

3    Your Lives group were holding that showed photographs of

4    hostages and identified the hostages as being Israeli

5    people?

6         A.    That's correct.

7         Q.    Right?

8         There's no indication in any of the materials that

9    you reviewed from other law enforcement or your own

10   investigation that Mr. Soliman seized one of those signs,

11   took one of those signs, personally held or read any of

12   those signs, correct?

13        A.    That's correct.

14        MR. KRAUT:  Okay, that's all I have on recross.

15   Thank you very much, Agent Chan.

16        THE COURT:  All right, thank you.

17        All right, Ms. Hindman, you may proceed, at

18   least -- do you plan on presenting your full closing

19   argument, essentially, at this point?

20        MS. HINDMAN:  I'm ready for that now.

21        THE COURT:  Okay.  All right.

22        And, I'm sorry.  Yes, you are excused.  Thank you,

23   Special Agent Chan.

24        You may proceed when you're ready, Ms. Hindman.

25        MS. HINDMAN:  Thank you.

62

1            I'm going to briefly go through the other elements

2    and then focus last on what I think is really the central

3    issue here about the element two, which is the perceived

4    national origin of any person.

5            The first element is met.  We have bodily

6    injuries.  We have burns.  One victim burned, I believe it

7    was 60, 65 percent of her body.  Several victims requiring

8    hospital treatment.  So we have bodily injury that was

9    caused by the defendant.  He both caused that and attempted

10    to cause those injuries to many others.

11            And what he used is the exact definition of

12    explosive or incendiary device under Section 232(5)(C),

13    which basically lays out what a Molotov cocktail is.  So we

14    have evidence supporting those.

15            We have evidence supporting the third element,

16    that the defendant acted willfully.  We have preparation

17    going back months, planning and preparation, in his own

18    statement, that occurred over a year.  And we have at least

19    a couple days in which he is making numerous purchases at

20    various stores for the components to build that Molotov

21    cocktail and also searching online to find the best place to

22    use it.

23            The fourth element is the attempts to kill, which

24    was his very goal in his own words, and it is also supported

25    by his actions when he threw a lit incendiary device into a

63

1    crowd.

2         The final element is the interstate and foreign

3    commerce, which is met here in numerous ways.  There were

4    businesses that had to shut down.  The components of the

5    incendiary device were manufactured outside of Colorado and

6    so moved through interstate and foreign commerce.  And he

7    also used the Internet to plan and prepare for his attack.

8         So going back to element two, which is really

9    where we are focused on:

10         The reason I was eliciting more evidence from the

11    witness was to support the whole context of what that second

12    element requires, which is that the defendant acted because

13    of actual or perceived national origin of any person.

14         Specifically, here we think he was focused on his

15    perceptions of the victims and who he was attempting to

16    kill.  But we don't -- you don't have to find that he got it

17    right.  You don't have to find the actual national origin of

18    those affected and those he was aiming for.

19         But what matters is his perception.  The

20    Government must prove that the attack would not have

21    occurred, but for the victim's actual or perceived national

22    origin as the defendant perceived it.

23         There can be more than one reason for the assault

24    and more than one reason why he executed the assault in this

25    particular way at this particular time and with this

64

1    particular group.  But his perception of their national

2    origin plays a determinative role in his decision to assault

3    and cause injury to these people.

4            Zionism, it is a question of law and it's defined

5    in some cases as a nationalistic movement to create the

6    Jewish homeland.  It is the movement for the establishment

7    of the Israeli state, the very establishment of the nation

8    whose national origin is at the center of this element here.

9            He repeatedly expresses in many ways his hatred

10   against Zionists, the supporters of the movement for the

11   very existence of the nation.

12           In our culture, it is very intertwined with

13   religion, but the case law does separate out Israeli

14   national origin from Jewish race or Jewish religion.  And

15   that's why in this case we are simplifying how we believe

16   the evidence most strongly supports the national origin

17   theory.

18           The national origin is defined, as defense counsel

19   said, in Espinoza v. Farah Manufacturing, a country where a

20   person was born, the country from which his or her ancestors

21   came, the country from which the person came.

22           It's a little complicated because the defendant

23   isn't using the term "Israel" very often.  He's using

24   "Zionism."  He's using "Palestine."  He's using "my land."

25   He's identifying Jerusalem.  And what he's identifying is

65

1    land that actually only very recently in history was

2    established as the nation of Israel.

3            But he is targeting the current occupiers of that

4    land that displaced his people and that are fighting for the

5    establishment of the Jewish state.  And so he's not

6    acknowledging them with the term "Israel" because the group

7    he determines to be his enemies are the group supporting the

8    very existence of that nation.  But in all of his words what

9    he is showing is that he is targeting Israelis and he is

10   targeting anyone who supports the existence of Israel on

11   that land.

12           And what he looks for online, he searches Zionist,

13   and we know, from his statement, he finds Run for Their

14   Lives.

15           I think arguably he got it wrong.  That is not --

16   Run for Their Lives is not a group that matches the

17   definition of what he's articulating as his enemy.  But his

18   perception of whatever he sees on their website, he

19   identifies -- he says it to the agent, "That group was

20   Zionist."

21           And when he showed up in Boulder on June 1st, he

22   saw Israeli flags and he said, "That's the group I'm going

23   for."  He recognized it to be the same group that was

24   advertised online.  He saw a child in a wheelchair with a

25   yamaka holding an Israeli flag.  He saw posters of hostages.

66

1          We don't know if he read it closely.  If he had,
2    he would have seen it was largely Israeli hostages, but he
3    saw that group and lit the wick and threw the bomb.
4          And so he acted in this way, at this time, injured
5    these people because of his perceptions of their
6    nationality, of their national origin, of their ancestry,
7    and projected onto them his own hate for Zionists.
8          And so that meets this element of the crime, and
9    we have probable cause to show that the defendant committed
10   the hate crime under Section 249(a)(2).
11         THE COURT:  All right.  So before you sit down,
12   the question I have, I mean, this -- the legal question of
13   whether Zionism is a type of national origin, right, I
14   suspect this will be litigated before the district judge.
15         It seems to me, right, I would be able to find
16   probable cause that there's evidence that Mr. Soliman was
17   motivated by the protesters' Zionist positions, or what he
18   understood to be their Zionist positions.
19         You know, in my mind, bouncing around, I'm
20   wondering, is Zionism a political movement and is the
21   political national movement or a national political
22   movement, is it a type of national origin?
23         I think of the Basque region in Spain.  Are the
24   people in the Basque region, are they Spanish or are they
25   not?  I guess it depends on who you talk to.  The national

67

1    government of Spain would view them as Spanish, but the

2    Basque people do not view themselves as Spanish.

3            So, you know, these issues, I think, ultimately

4    need to be decided by the district judge -- or this issue

5    about is Zionism a category of national origin.

6            My question for you, however, Ms. Hindman, is, if

7    I find that there's probable cause that Mr. Soliman was

8    motivated by the protesters' Zionism, then is that enough to

9    find that there is probable cause for this case to proceed

10   on the hate crime charge as it is teed up in the criminal

11   complaint?

12           MS. HINDMAN:  Yes, although I think that there

13   isn't a clear -- there is not a specific case law that says

14   Zionism equals national origin.  It's not that clear in the

15   case law.

16           I think what we have here is, no matter what word

17   he uses -- and he uses many -- we're focusing on Zionism,

18   because that is one of the things he repeats a lot.  He says

19   "Free Palestine."  He talks about the occupiers.  He does

20   talk about Israel.  He talks about the land that's occupied,

21   the current occupiers of the land.

22           So whatever words he is using, he is identifying

23   the nation that is currently Israel and he is targeting his

24   animosity towards the people associated with that current

25   occupation of that land.

1          And so he is using the term "Zionist," but he's

2   using a lot of other terms to show us that he defines his

3   animosity towards the current occupiers of land that we all

4   know to be Israel.  And so he is showing that his animosity

5   is towards the national origin of a group of people.

6          The second element requires that he did this

7   because of his perceptions of the national origin of any

8   person.  It doesn't have to be his perceptions of the

9   specific national origin of the victims.  It doesn't have to

10  be his perception of the specific national origin of the Run

11  for Their Lives groups or anyone in the park.  It can be of

12  any person.  And so he is -- in some ways, he is projecting

13  it onto this group of victims and that is his perception.

14         And so we do think that he is looking at these

15  victims, seeing these symbols, seeing these symbols of

16  Israel, and projecting onto them his animosity.

17         But it doesn't matter if he actually perceives

18  them to be Israeli, but he is attacking them in this way

19  because his perceptions of the national origin of the group

20  of people he uses the term "Zionist" for, but the group of

21  people currently occupying the nation of Israel.

22         THE COURT:  All right, thank you.

23         MS. HINDMAN:  Thank you.

24         THE COURT:  Mr. Kraut.

25         MR. KRAUT:  Thank you very much, Your Honor.

69

1           This hearing has raised, I think, three really

2   important questions, but only two this Court needs to really

3   grapple with for the preliminary examination.

4           The three questions that I've identified are, one,

5   what is the legal definition of national origin?  And the

6   parties have agreed on that.  Again, according to the

7   Supreme Court, the country where a person was born, or more

8   broadly, the country from which his or her ancestors came.

9           That quote from Espinoza, to my knowledge, does

10  not include the country from which a person came.  So I

11  believe the Supreme Court to have defined the term "national

12  origin" in that case in a pretty limited way:  Again, the

13  country where a person was born or from which his ancestors

14  came.

15          So that's a question of law that I think this

16  Court does need to answer in order to resolve the issue of

17  probable cause at this hearing.

18          The second question that I do not think the Court

19  needs to deal with is the objective factual question of is

20  Zionism a national origin.

21          And I say I don't think the Court needs to answer

22  that question because what really matters for this hearing

23  is not whether or not Zionism is, in fact, a national origin

24  as a matter of law or a matter of fact or philosophy or

25  anything of that nature.

70

1          What matters here is, did Mr. Soliman define

2     Zionism as a national origin in his mind.

3          That's the third question and that's really what

4     matters.  What matters for this preliminary examination is a

5     question about Mr. Soliman's subjective belief:  Did he

6     believe, did he define Zionism as a national origin?

7          And to ask that question -- to answer that

8     question, we must use the Supreme Court's definition of

9     national origin.  So in his mind, does he believe Zionism is

10    equivalent to the country where a person was born or the

11    country from which a person's ancestors came?

12          The evidence presented at this hearing, and in the

13    Complaint, clearly answers that question no, that's not how

14    he defines Zionism.

15          He defines Zionism according to political opinion,

16    not national origin or ancestry.  He defines Zionism

17    repeatedly in interviews, according to witness statements,

18    on videos, apparently, as a belief that -- let me make sure

19    I have the words exactly right:  A belief in supporting the

20    existence of Israel on what he referred to as "his land,"

21    Palestine.

22          He never used any terminology or any definition

23    that suggests he defined Zionism according to national

24    origin.  Every time he was asked and every time the agent

25    was asked, it became very clear that his definition hinges

1    on political views.

2          He did not do an Internet search for an Israeli

3    event.  He did an Internet search for a Zionist event.  He

4    did not read the signs showing that the hostages were

5    Israeli, because it didn't matter to him whether the

6    hostages were Israeli or not.

7          What mattered to him is that he had defined in his

8    mind the people in the Run for Their Lives group as

9    Zionists.  And that subjective definition, whether right or

10    wrong, is what matters most here today.

11          The law is very clear:  Political views are not

12    listed in this statute as a protected group.  People who

13    adhere to certain political views is not one of the groups

14    identified in 249(a).

15          Now, at a preliminary examination, of course, it

16    is well settled that inferences supported -- reasonably

17    supported by evidence, can and should be drawn in favor of

18    the prosecution.

19          But here, the evidence is so clear that Mr.

20    Soliman was motivated by political viewpoints, not national

21    origin, that it leaves no room for inferences to be drawn.

22    Inferences are drawn when there is evidence that doesn't

23    necessarily lead to a very clear conclusion.  And at a

24    preliminary examination, the Court can draw inferences that

25    are reasonable conclusions, based on that type of unclear

1    evidence.

2           Here, the evidence is clear:  It only points to

3    one conclusion.  There's no need for the Court to make any

4    inferences and it's not reasonable for the Court to infer a

5    different conclusion from the one that is plain.

6           Political views, in Mr. Soliman's mind, whether or

7    not this is true or not doesn't matter; but in Mr. Soliman's

8    mind, political views are not equivalent to or a proxy for

9    national origin.

10          And, of course, that also happens to be true.

11   Support for the existence of Israel is a political view, not

12   a national origin.  There's no way that anyone could say,

13   and there's no way Mr. Soliman ever said or believed, that

14   everyone from a particular nation has the same exact view

15   regarding the conflict in the Middle East.  That would be

16   absurd.  Even among people who live in Israel, they do not

17   all have the exact same view regarding the conflict in the

18   Middle East.

19          Support for people who were killed or taken

20   hostage on October 7th, 2023 in the attack on Israel is,

21   again, a political view, not a view relating to national

22   origin.  People of all nations hold these views.  And that's

23   reflected by the language on the Run For Your Lives -- I'm

24   sorry, Run for Their website.  They recognize, in creating

25   an open invitation for all to come and support their cause

1    that, one, there are hostages who have been taken by a group

2    they deem to be terrorist forces from all different

3    countries and they invite people to bring all different

4    flags to show support for those hostages and those victims.

5    Same is true of people who have been killed in the conflict

6    there since October 7th.

7            They invite all people to come support their

8    cause, regardless of religion or national origin of those

9    who might come and march with them and walk with them or run

10   with them.

11           This is a reflection of the objective truth that a

12   political viewpoint to support those whose lives have been

13   affected by the ongoing conflict in the Middle East is not

14   the same as a national origin.

15           THE COURT:  Would you -- I'm sorry to interrupt.

16           Would you, please, directly respond to Ms.

17   Hindman's argument that Mr. Soliman defines his animosity

18   towards the group of people that are the current occupiers

19   of the land we know to be Israel?  And she went on to say

20   that Mr. Soliman is showing animosity, based on the national

21   origin of that group of people.

22           MR. KRAUT:  My first response to that is that's

23   not what the evidence shows.  The evidence -- and it's a

24   subtle difference, but it's critical in this case.

25           The evidence is not that he is motivated by hatred

74

1  of people who live in Israel.  He is motivated by what he

2  describes as hatred of people who support the existence of

3  Israel in that land.  So it doesn't matter to him where

4  someone lives.

5          He's -- according to this logic that's been

6  described by Agent Chan and in the Complaint, this is a

7  person who would equally feel animosity towards a person who

8  is Israeli and supports the existence of Israel in what Mr.

9  Soliman considers to be Palestine.  He would dislike that

10 person as much as a person who lives in any other country

11 who supports the existence of Israel on that land.

12         So the key is that I don't think the Government is

13 fairly characterizing the evidence when they say Mr. Soliman

14 defines Zionism as people who occupy the land.

15         That's not what the evidence was.  The evidence is

16 Mr. Soliman defines Zionism as people who support the

17 existence of the land.

18         And that difference, in my view, is fatal to their

19 ability to proceed against Mr. Soliman under 249.  249 does

20 allow, of course, prosecution of someone when their action

21 is based on hatred of a group or a person because of where

22 that person is from or where that person's ancestors are

23 from, but that's not what we have here.

24         We have clear evidence pointing to a person's

25 mind, a subjective belief -- a subjective state of mind that

75

1    dislikes people, not because of where they're from or where

2    their ancestors are from, but because of what they think.

3    And that is not covered by 249(a).

4         The Government mentioned that -- and I agree --

5    that the case law indicates the Government has a burden to

6    show that the attack would not have occurred, but for Mr.

7    Soliman's perception of the victim's national origin.  Ms.

8    Hindman said that as part of her argument, I completely

9    agree.

10        If the question is, would this attack have

11   occurred, but for Mr. Soliman's perception of the victim's

12   national origin, according to what we heard today, the

13   answer to that has to be yes, it still would have occurred.

14   He never even perceived much of anything related to these

15   people's national origin.

16        The Government, I think, conflates viewing the

17   Israeli flag in Boulder moments before the attack began with

18   being motivated by a hatred of the country of Israel or a

19   hatred of the Israeli people.  Those are not the same thing,

20   and that's not how Mr. Soliman viewed the flag in that

21   moment.

22        It was made clear on recross -- or maybe

23   originally on cross, that the flag was merely a logical

24   signal to Mr. Soliman of the group he had previously

25   identified as the target.

76

1          The flag itself was not a motivator to Mr.

2    Soliman.  He didn't need any additional motivation.  At that

3    point, he had already collected all the materials he would

4    use.  He had already, as this Complaint lays out, got a

5    different phone, done all of the factual things that really

6    we're not here arguing about at this point.

7          The flag provided no additional motivation and

8    didn't need to.  The flag was nothing more than a signal to

9    him of the target he had previously identified, and Agent

10   Shan agreed with that.  Agent Shan also made clear that Mr.

11   Soliman was angry with the governments of the United States

12   and the United Kingdom for supporting the Israeli military

13   in this ongoing conflict.

14          But, of course, not all Americans, not all

15   citizens of the United Kingdom share the same views of

16   supporting the Israeli military.  And Mr. Soliman never said

17   that he hates all Americans or hates all citizens in the

18   United Kingdom.  He said he did not like the governmental

19   decisions to support the actions of the Israeli military

20   during this conflict.

21          That is a much different reasoning, a much

22   different motive, which is so important in these 249 cases,

23   than hating people because of who they are or where they

24   live.

25          Recently, in a completely unrelated case that

77

1    didn't deal with anything like this at all, I think it was a

2    922(g) case, or something of that nature, Magistrate Judge

3    Neureiter, here in our own district, declined to find

4    probable cause.

5         And one of the reasons he did in a written

6    order -- and this is United States v. Kouyate,

7    K-O-U-Y-A-T-E, it's at 2020 Westlaw 7384862, District of

8    Colorado (2020), Judge Neureiter held that he relied, in

9    part, on the rule of lenity. And he noted: The rule of

10   lenity is a familiar principle that ambiguity concerning the

11   ambit of criminal statutes should be resolved in favor of

12   lenity. It seeks to ensure that legislatures, not

13   prosecutors, decide the circumstances when people may be

14   sent to prison. It seeks to ensure that if a legislature

15   wishes to attach criminal consequences to certain conduct,

16   to deprive persons of their property, liberty, or even

17   lives, it provides fair warning.

18        And he cites United States v. Rentz, R-E-N-T-Z,

19   777 F.3d 1105, page 1113, 10th Circuit, 2015.

20        THE COURT: Could you repeat that -- I'm sorry to

21   interrupt -- the Westlaw citation for that decision, please.

22        MR. KRAUT: Yes. 2020 WL 7384862.

23        THE COURT: 7384862?

24        MR. KRAUT: Yes.

25        And that was a finding of no probable cause in a

78

1   922(a)(6) case, which I think is relying on the ATF form.

2   Facts of that case aren't nearly as important, in my view,

3   as Judge Neureiter's reliance on the rule of lenity.

4           And it's interesting here, because what we have --

5   what we've arrived at between our competing arguments is a

6   situation in which we're debating the ambit of this

7   particular statute, 249(a).  And I do believe that there is

8   no real ambiguity because I think the language of the

9   statute is so clear.

10          The statute says:  Race, religion, sexual

11  orientation, gender, national origin.  I don't believe that

12  this leaves the ambiguity.  The Government is trying to, in

13  my view, inject some ambiguity into this statute by asking

14  the Court to expand the meaning of national origin to

15  include political viewpoints.

16          The rule of lenity comes back into play to say if

17  there really is an ambiguity, if the Government has

18  successfully convinced the Court that this statute is

19  ambiguous or that the definition of national origin is

20  somehow ambiguous, even though we've agreed on it, the rule

21  of lenity says resolve that ambiguity in favor of the

22  defense.

23          And so my first argument is there is no ambiguity

24  in this statute.  It's clear, and it's clear Mr. Soliman's

25  behavior was motivated by political belief, not national

79

1    origin, we don't need to get there.

2         But as a secondary argument, if the Government has

3    successfully injected ambiguity where there otherwise is

4    none, the rule of lenity brings the Court to the same

5    conclusion.

6         In preparing for today, I also wanted to educate

7    myself a bit about how inferences can affect a court's

8    ruling at the preliminary hearing stage.

9         I didn't find a case exactly on point, but I did

10    find a case in which the Eastern District of Wisconsin, back

11    in 1968, it's an old case, held that inferences may be drawn

12    only where there are proven facts and evidence upon which

13    the inferences can be soundly based.  That was Walyd v.

14    Kane, W-A-L-Y-D v. Kane, K-A-N-E, 283 F. Supp. 450 at page

15    452.  The facts and evidence do not allow for the inference

16    that the Government is asking the Court to draw.

17         It's not a close call here about whether or not

18    Mr. Soliman defined Zionism in his mind as in relation to

19    political viewpoint versus national origin.

20         National origin of the victims in this case did

21    not matter to Mr. Soliman.  National origin of the hostages

22    for whom the victims were raising awareness did not matter.

23         What mattered to Mr. Soliman was his perception

24    that these people shared a political viewpoint with one

25    another that he opposed.  That conduct, while reprehensible,

80

1    illegal in a variety of ways, does not violate 249(a)(2)(A).

2            If I could have just a moment, please, to check in

3    with Ms. Beck.

4            THE COURT:  Yes.

5            MR. KRAUT:  Thank you.

6            (Pause).

7            Okay.  Thank you very much, Your Honor.

8            THE COURT:  All right.  Thank you.

9            Ms. Hindman, do you have a rebuttal?

10           MS. HINDMAN:  Yes, very briefly.

11           Defense counsel started off by conceding that you

12   should be looking at the evidence in the light most

13   favorable to the Government.  And then he started conflating

14   some statutory and factual ambiguity and trying to get the

15   rule of lenity to lean towards an interpretation in the

16   light most favorable to the defense.

17           I think that the rule of lenity is a statutory

18   interpretation principle that is not at play here.  The

19   statute is clear, it's national origin and that's what we're

20   talking about.

21           In looking at the evidence in light most favorable

22   to the Government, there is sufficient evidence to find

23   probable cause, including for this one element that we are

24   discussing in great detail.

25           The defendant's statement to law enforcement is

81

1    long and it's rambling and it's hard to understand and it's

2    repetitive.  But I think that if we want clarity on what the

3    defendant actually said, the handwritten document in his car

4    that I asked on direct examination of the special agent,

5    there were two quotes that came into evidence.

6          One, the defendant says Zionism is our enemies

7    until Jerusalem is liberated and they are expelled from our

8    land.  He also talks about Zionists and its followers and

9    believers are our enemies.

10          There is a lot of political belief intertwined in

11    this.  But he is defining Zionists is our enemies until

12    Jerusalem is liberated and they are expelled from our land.

13    He is saying that Zionists are the occupiers of Jerusalem.

14          We all know the occupiers of Jerusalem is the

15    nation of Israel.  He looked online for a group.  He found

16    one, and when he saw them, they were carrying a flag for the

17    nation of Israel, and he said to the agent that when he saw

18    that flag, he knew it was the Zionist group he was looking

19    for.  He was targeting a group, based on his perceptions of

20    people's national origin because his enemy is the occupiers

21    of a land that is Israel.

22          The other quote from his handwritten document in

23    his car explained the 1187 he wrote on his shirt.  To put it

24    into context, though, he is standing before a group waving

25    Israeli and American flags and throwing a lit Molotov

82

1    cocktail at them while wearing a shirt that says 1187.   In

2    his handwritten document, he says, "In 1187, Muslims

3    returned and liberated Jerusalem after 88 years of

4    oppression and persecution."

5           He is identifying his enemies to be the nation

6    that occupies Jerusalem.  He is identifying a flag of that

7    nation to identify his victims and he is wearing a shirt

8    signifying the year in which he perceives his people moved

9    them out of that land and that nation.

10           THE COURT:  What do I make of the facts that Mr.

11    Soliman didn't have issues with all Jews?  He worked with

12    Jews, no issues.  He drove Jewish customers as an Uber

13    driver.

14           So how does that impact the probable cause

15    analysis here?

16           MS. HINDMAN:  If we were continuing to proceed on

17    multiple theories of race and religion, as well, you could

18    look at that evidence to undercut that those were his

19    motivating factors of race and religion.

20           The case law does differentiate between the Jewish

21    race, the Jewish religion, and the Israeli national origin.

22    And so because some of those statements about him

23    differentiating and not targeting the entirety of the Jewish

24    population and, specifically, he talks about his

25    interactions with the Jewish people in America not

83

1    completely coinciding with Zionists, so we are not asking

2    you to find probable cause on those alternate theories under

3    Section 249 for race and religion.  That would be more tied

4    to the identity with Judaism.

5             THE COURT:  And so you're, again, relying on the

6    fact that he used the Israeli flag that he saw to identify

7    for himself the group that he wanted to target by virtue of

8    using the Israeli flag, that in your -- from your point of

9    view, is what supports the national origin aspect of this

10   charge?

11            MS. HINDMAN:  The flag is one piece of evidence

12   that does support it.  And it's a piece of evidence that he

13   points out to the investigators as signifying -- he looked

14   online for a Zionist group.  When he saw the flags of Israel

15   there, he knew that that was the group he had found online

16   and so he knew to throw the Molotov cocktail at that group.

17            And so he gave that as a point of reference for

18   his perception of how he knew he was identifying the right

19   group.

20            THE COURT:  Okay.  Thank you.  All right.

21            I need to take a brief recess, maybe about 10 or

22   15 minutes, and then I will come back and let you know how I

23   am proceeding in this matter.

24            THE COURTROOM DEPUTY:  All rise.  Court is in

25   recess.

84

1              (Recess from 2:10 p.m. to 2:25 p.m.)

2              THE COURT:  Thank you.

3              THE COURTROOM DEPUTY:  All rise.  Court is in

4    session.

5              THE COURT:  Thank you.

6              THE COURTROOM DEPUTY:  Please be seated.

7              THE COURT:  All right.

8              I thank both sides for their presentations and

9    their arguments.

10             As I indicated at the outset of this hearing, the

11   purpose of this hearing is to determine whether there is

12   probable cause to believe that the offense alleged in the

13   criminal complaint has been committed and that it was

14   committed by Defendant Soliman.  I'm not finding that, in

15   fact, it was committed and that Mr. Soliman is guilty of the

16   crime charged.

17             There are five elements, as both sides laid out in

18   their arguments -- five elements to this charged crime --

19   this charged hate crime.

20             Under 18 U.S.C. Section 249(a)(1) and (2):

21             First, that the defendant caused bodily injuries

22   to the victims through the use of a dangerous weapon.

23             It has been established, as we heard today from

24   Special Agent Chan's testimony -- and I will -- as a slight

25   digression, I do find Special Agent Chan's testimony

85

1    credible and reliable.

2              He indicated what information he knew of directly,

3    what he did to prepare for this hearing.  He explained his

4    involvement in the investigation, what files, interview

5    notes, videos, and photos he reviewed.  And I have no reason

6    to doubt the credibility of his testimony.

7              So the Government's presentation today relied,

8    really, almost exclusively on his testimony.  So through his

9    testimony, it was established that videos, interviews,

10   photos revealed that Mr. Soliman allegedly had in his

11   possession Molotov cocktails that contained gasoline and had

12   a fabric type of wick that was immersed in the gasoline, and

13   he ignited two of those Molotov cocktails and threw them at

14   protesters.  And protesters were injured, a number of them

15   receiving -- incurring burns to the body, and at least one

16   person has suffered burns over 60 percent of their body.

17   And at least one person, as I recall from the testimony,

18   remains in the hospital.

19             So element one has been established.  Mr. Soliman

20   engaged in conduct by throwing Molotov cocktails at the

21   victims.  They were injured and the Molotov cocktails meet

22   the Criminal Code definition of a dangerous weapon.

23             I will skip over element two for a second.

24             Element three:  Did Mr. Soliman do this willfully?

25             Through Special Agent Chan's testimony, we learned

86

1  that the interview notes revealed that Mr. Soliman planned

2  and prepared.  He had searched on the Internet and also on

3  his phone when there would be Zionist protests in Boulder,

4  and he saw the one scheduled for June 1st and he planned and

5  prepared to be present at that protest.

6          And it wasn't just that he planned and prepared to

7  be -- to be present, in advance of showing up on the scene,

8  at least I think it was two days -- it might have been

9  longer, but days in advance of the protest he purchased and

10  acquired materials that were found on the scene and that he

11  used allegedly to target the protesters.

12          Those materials included a tote that receipt show

13  he purchased from Home Depot.  The tote contained, I believe

14  it's carafes, Ball canning jars, fabric that was used as

15  wicks, so that was found on the scene.  He also purchased

16  some materials from Target and, I believe, Walmart and then

17  he had purchased gasoline, I think it was in Castle Rock,

18  before June 1st.

19          So there is evidence -- reliable evidence, to

20  establish probable cause that Mr. Soliman willfully engaged

21  in the conduct alleged.

22          Then element four:  Whether he attempted to kill

23  the victims.

24          We've learned through Special Agent Chan's

25  testimony that Mr. Soliman was using dangerous devices and

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

87

1    throwing them at the victims, and these were explosive

2    devices.  So there is evidence to indicate that Mr. Soliman

3    did attempt to kill the victims -- or evidence to establish

4    probable cause of that.

5            And then the fifth element:  Interstate and

6    foreign commerce.  Whether the weapons were obtained in a

7    way that impacts interstate and foreign commerce.

8            And we heard in the testimony that the materials

9    that Mr. Soliman allegedly purchased are not made here in

10   Colorado.  The gas wasn't produced here in Colorado, and the

11   materials he purchased from Home Depot, Target, and Walmart

12   were not made here in Colorado.

13           So I know the Government also points to other

14   things, like the businesses being impacted in that area, but

15   certainly, I point to the materials he used to create

16   weapons and to cause harm passed through interstate

17   commerce.

18           So now we turn to the hotly contested element two:

19   National origin.

20           I took a look at Judge Neureiter's decision, very

21   quick look, where Judge Neureiter was talking about the rule

22   of lenity.

23           And I just need one moment to pull up that case

24   again.  Give me one second.  Okay.

25           So again, that's United States v. Kouyate -- I'm

88

1    not sure if I'm pronouncing that correctly.  In any event,

2    2020 Westlaw 7384862 at star 6 is where Judge Neureiter has

3    his analysis in terms of why he's applying the rule of

4    lenity.

5              And then he first articulates, right, it's a

6    familiar principle that ambiguity concerning the ambits of

7    criminal statute should be resolved in favor of lenity.

8              Then he's talking about the at-issue statute in

9    that case and it controlled -- it concerned guns.  And Judge

10   Neureiter points to four conclusions that lead him to apply

11   the rule of lenity.

12             And the first one I find is important here.  He

13   finds that there was no intention by Congress with that

14   particular statute to regulate the secondary gun market.

15             Here, it is clear the statute, the Hate Crimes

16   Act, is not ambiguous about Congress's intent to criminalize

17   hate crimes where people are targeted based on their

18   national origin.  So I do not find that the rule of lenity

19   applies in this instance.

20             The big debate is whether Mr. Soliman was

21   motivated by the protestors' national origin.

22             One could construe the evidence and arguments that

23   were presented by the Government today as that Mr. Soliman

24   was motivated by hatred of those who support the creation

25   and maintenance of the Israeli state.  So, therefore, one

89

1   could argue that, by virtue of having animosity for people

2   who support the existence of the Israeli state, that then

3   brings this matter under the element of national origin.

4           Also, the evidence that establishes probable cause

5   with respect to that theory of national origin, it's the

6   notation of 1187 that was found in the note in Mr. Soliman's

7   car and 1187 that was written on his T-shirt.

8           And he notes that, as I wrote down here, that is

9   the year that the Muslims returned and liberated Jerusalem.

10  So he is taking issue with people who continue to support

11  the existence of the state of Israel.

12          Now, ultimately, it's for a jury to decide, based

13  on whatever jury instructions are presented to it, in terms

14  of whether the evidence truly supports a finding of guilty

15  with respect to the national origin claim, but that is not

16  what we're here for today.

17          We're here to determine whether there's probable

18  cause to believe that Mr. Soliman committed the offense that

19  is charged in the Complaint.  And I do find that there is

20  probable cause, given that I have to view the evidence at

21  this point in the light most favorable to the Government.

22          I completely understand defense counsel's

23  arguments that there's evidence that cuts against the

24  national origin theory, but there's also evidence that

25  supports and establishes probable cause to support the

90

1    national origin theory.

2         So, therefore, I find that there is probable cause

3    for this case to proceed, and I believe that the parties

4    need to obtain additional dates from the district judge.

5         Ms. Hindman, is there anything else you wish to

6    bring to the Court's attention?

7         MS. HINDMAN:  So since this case is not yet

8    indicted, we actually need to do a status conference that

9    might be converted to an arraignment and discovery

10   conference.

11        We have been looking at next Friday, the 27th.

12        Unfortunately, I have a detention hearing in front

13   of Judge Neureiter at 10 a.m. that I expect to be lengthy,

14   but we could do either 9.30 or 1:30 or 2:00, whatever works

15   on your schedule, next Friday, the 27th.

16        THE COURT:  Okay.

17        Ms. Galera, when can we set this next Friday?

18        THE COURTROOM DEPUTY:  If Your Honor is okay with

19   it, 9:30 is preferable on Friday.

20        THE COURT:  Okay, that's fine, so 9:30.

21        Mr. Kraut, does 9:30 work for you?

22        MR. KRAUT:  Yes, we can be here then.  Thank you,

23   Your Honor.

24        THE COURT:  All right, thank you.  We'll be in

25   recess on this matter.  And I'll quickly turn to -- as soon

91

1    as Ms. Galera, you're ready, we can start the 2 p.m. docket,

2    so just let me know.  I'll go back in chambers.

3          THE COURTROOM DEPUTY:  Yes, Your Honor.  I'll let

4    you know.

5          THE COURT:  Thank you.

6          THE COURTROOM DEPUTY:  All rise.  Court is in

7    recess.

8          (WHEREUPON, the hearing concluded at 2:39 p.m.)

9

10

11                    CERTIFICATE

12          I, Dyann Labo, certify that the foregoing

13   transcript from the electronic sound recording from the

14   proceedings is in compliance with Chief Justice Directive

15   05-03.

16                    Dated:  July 7, 2025

17   /s/ Dyann Labo
     DYANN LABO
18   Transcriber

19

20

21

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**

scheduling@pattersontranscription.com